AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>ROMAN RUIZ-ALVAREZ and<br>JOSE EDUARDO ARELLANO-AGUAYO,<br><br>Defendants. | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br><br>17-MJ17-2940 |

Complaint for violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(vii)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE KAREN L. STEVENSON | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>November 19, 2017 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vii): Possession with Intent to Distribute Marijuana]

On or about November 19, 2017, in Los Angeles County, within the Central District of California, defendants ROMAN RUIZ-ALVAREZ and JOSE EDUARDO ARELLANO-AGUAYO knowingly and intentionally possessed with intent to distribute at least 100 kilograms of a mixture or substance containing a detectable amount of ~~methamphetamine~~ marijuana, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B)(vii).

FILED
CLERK, U.S. DISTRICT COURT
NOV 20 2017
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>/S/<br><br>OFFICIAL TITLE<br>Timothy O'Hara, Special Agent<br>Homeland Security Investigations |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[(1)]<br>KAREN L. STEVENSON | DATE<br>11/20/17 |
|---|---|

[(1)] See Federal Rules of Criminal Procedure 3 and 54

AUSA Wesley Gorman x. 2589

## AFFIDAVIT

I, Timothy O'Hara, being duly sworn, declare and state as follows:

### I. PURPOSE OF THE AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against ROMAN RUIZ-ALVAREZ ("RUIZ-ALVAREZ") and JOSE EDUARDO ARELLANO-AGUAYO ("ARELLANO-AGUAYO") for a violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(vii) (possession with intent to distribute marijuana).

2. This affidavit is also made in support of an application for a warrant to search the following digital devices seized on or about November 19, 2017, now in the custody of the Homeland Security Investigations ("HSI") Los Angeles Border Enforcement Security Task Force ("LA BEST") in San Pedro, California:

   a. Gray Garmin GPS Map 78S seized from RUIZ-ALVAREZ's pocket ("GARMIN");

   b. Yellowish-green Sony phone seized from the driver's console of the pleasure craft ("SONY PHONE"); and

   c. White Samsung phone seized from ARELLANO-AGUAYO's belt clip ("SAMSUNG PHONE");

(collectively, the "SUBJECT DEVICES"). The requested search warrant seeks authorization to seize any data on the SUBJECT DEVICES that constitutes evidence or fruits of violations of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B)(vii) (possession with intent to distribute marijuana), 846 (conspiracy to distribute marijuana), and 960(a)(1), (b)(2)(G)

(importation of marijuana) (collectively, the "Subject Offenses"), or any SUBJECT DEVICE that is itself an instrumentality of the Subject Offenses. The SUBJECT DEVICES are identified in Attachment A to the search warrant application. The list of items to be seized is set forth in Attachment B to the search warrant application. Attachments A and B are incorporated herein by reference.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. INTRODUCTION

4. I am a Special Agent ("SA") with the Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"), and have been so employed since October 2008. I am currently assigned to the HSI Los Angeles Border Enforcement Security Task Force ("LA BEST"). My responsibilities include investigating violations of federal and state criminal laws, including crimes involving maritime smuggling, drug trafficking, money laundering, fraud, and immigration violations in the Central District of California. During my tenure with HSI, I have conducted and participated in numerous criminal

Instrumentality Protocol

investigations, including investigations involving drug trafficking, contraband smuggling, money laundering, child exploitation, fraud, and intellectual property rights violations. During these investigations, I have participated in the execution of numerous search warrants and seized evidence of such violations. Additionally, I have conducted numerous arrests and interviewed numerous suspects and witnesses.

5. I am a graduate of the Federal Law Enforcement Center ("FLETC") in Glynco, Georgia, where I completed the Basic Criminal Investigator Training Program and the HSI Special Agent Training Program. I received formal training in the detection and investigation of violations investigated by HSI, including drug crimes, contraband smuggling, firearms crimes, gang-related crimes, human trafficking, child pornography, fraud, immigration, and intellectual property rights violations. I was previously employed with ICE Enforcement and Removal Operations as an Immigration Enforcement Agent from January 2007 until October 2008.

### III. SUMMARY OF PROBABLE CAUSE

6. On or about November 19, 2017, Wardens from the State of California Department of Fish and Wildlife ("CA DFW") saw a pleasure craft coming towards them on the wrong side of the channel at the Alamitos Bay. The CA DFW Wardens stopped the pleasure craft. RUIZ-ALVAREZ and ARELLANO-AGUAYO were the only two people onboard. RUIZ-ALVAREZ opened the cabin door and the CA DFW Wardens could see a large number of black trash bags filling the cabin that, based on the Wardens' training and

Instrumentality Protocol

experience, was indicative of maritime drug smuggling. The CA DFW Wardens boarded the pleasure craft and found that the black trash bags were filled with marijuana. The marijuana weighed approximately 1,119 pounds, including packaging. In Mirandized interviews, RUIZ-ALVAREZ and ARELLANO-AGUAYO both admitted that they had brought the marijuana from Mexico. The SUBJECT DEVICES were found onboard the pleasure craft.

### IV. STATEMENT OF PROBABLE CAUSE

#### A. Background on Maritime Drug Smuggling

7. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in maritime narcotics, smuggling operations in Southern California, including operations to smuggle marijuana into the United States by boat, typically operate as follows:

   a. Narcotics smugglers who intend to bring narcotics into the Unites States illegally, bring narcotics to areas in Mexico near the United States-Mexico border. Narcotics smugglers will often bring narcotics into the United States by boat, including pleasure craft.[1]

   b. The laws of the United States prohibit the importation of narcotics into the United States unless certain legal requirements are met. Narcotics smugglers do not present smuggled narcotics for inspection to determine if said legal requirements were met. Instead, narcotics smugglers often conceal narcotics within boats in order to circumvent United

---

[1] A "pleasure craft" is a type of boat, typically with an enclosed forward cabin.

States laws. To assist their navigation of the United States coastline, narcotics smugglers typically use Global Positioning System ("GPS") units.

      c.   Drug smugglers will conceal the drugs onboard their boat in order to prevent detection by law enforcement, and also to protect the drugs from water damage. Often, large volumes of drugs are concealed in black opaque plastic.

      d.   After surreptitiously crossing the United States-Mexico border by boat, narcotics smugglers travel to pre-determined areas where the narcotics will be unloaded from the boat and loaded into waiting vehicles called "load vehicles."

      e.   Narcotics smugglers will often contact accomplices onshore who will inform them exactly where to direct the boat to meet the waiting "load vehicles." Once unloaded into load vehicles, the narcotics are then typically transported to locations, known as "stash houses," where the narcotics are parceled off to narcotics dealers. Many such stash houses are located in the greater Los Angeles area.

      f.   Members of maritime drug smuggling operations often use digital devices, including cellular telephones, to communicate with one another about and in furtherance of those operations. For example, operators of vessels importing smuggled contraband from outside the United States will often use digital devices, including cellular telephones, to communicate with members onshore to determine the location of a designated landing site or to learn whether law enforcement officials are present. Similarly, onshore members involved in

Instrumentality Protocol

the loading and unloading of smuggled contraband will use digital devices, including cellular telephones, to communicate with members involved in packaging and shipping the drugs, to recruit other members, to coordinate travel and meetings, to communicate with the vessels transporting the drugs, and for other purposes connected with the drug smuggling operation. Drug smugglers may also send photographs with their digital devices in order, for example, to confirm that the drugs are onboard the boat, the quantity of drugs, the location of the boat, or the arrival and/or departure of the drugs or boat. To send and receive such messages and photographs drug smugglers often use social media and other applications such as Facebook messenger, Snapchat, FaceTime, Skype, and WhatsApp.

    **B.    CA DFW Wardens Stop Pleasure Craft with RUIZ-ALVAREZ and ARELLANO-AGUAYO and Find Marijuana and the SUBJECT DEVICES**

    8.    On or about November 19, 2017, at approximately 11:00 a.m., Wardens Paul Zurawski and Michael Louden of the CA DFW were leaving Alamitos Bay while on patrol. They saw a white Bayliner pleasure craft, bearing California registration number CF 6973 NR, (the "pleasure craft") moving towards them on the wrong side of the channel (a violation of California Code of Regulations, Title 14, Division 4, Chapter 1, Article 5, Section 6600.1(a) Rule 9 and 10).

    9.    Warden Zurawski hailed the pleasure craft over the loud speaker, informing those onboard that they were transiting on the wrong side of the channel. The two males in the pleasure craft, later identified as RUIZ-ALVAREZ and ARELLANO-AGUAYO, did

not heed the instructions and kept moving into the harbor. Warden Zurawski then turned on the patrol vessel's blue lights and initiated a stop on the vessel.

10. The Wardens saw RUIZ-ALVAREZ speaking on a cellular telephone at the time they hailed the pleasure craft. They saw RUIZ-ALVAREZ put the phone down near the driver's console of the pleasure craft. The Wardens later recovered the SONY PHONE from the driver's console area of the pleasure craft.

11. The Wardens asked RUIZ-ALVAREZ and ARELLANO-AGUAYO if they had any fish on board their vessel and they replied "No." When the Wardens asked if they could see inside the vessel cabin, RUIZ-ALVAREZ opened the cabin door and ARELLANO-AGUAYO pulled two backpacks from the cabin. While the cabin door was open, the Wardens saw that the cabin was filled with packages covered by black plastic trash bags. Warden Louden asked what the bags contained and RUIZ-ALVAREZ said that he did not know. When asked if the pleasure craft belonged to RUIZ-ALVAREZ, he shook his head side to side, indicating that it did not.

12. Because, among other things, the cabin was filled with packages wrapped in black opaque plastic, consistent with maritime drug smuggling, and because the boat did not contain fish or any other items indicating that the pleasure craft was on the water with a legitimate purpose, the CA DFW Wardens believed that there was probable cause to believe that a crime was being committed on the pleasure craft. The CA DFW Wardens boarded the boat. Warden Louden opened one of the bags and smelled the odor of marijuana.

Instrumentality Protocol

13. RUIZ-ALVAREZ and ARELLANO-AGUAYO were then detained, pending further investigation. During a check for weapons, the Wardens found the GARMIN in RUIZ-ALVAREZ's pocket, and the SAMSUNG PHONE clipped to ARELLANO-AGUAYO's belt. The CA DFW Wardens towed the pleasure craft to the Alamitos Bay public dock at Ballast Point.

14. At the dock, Warden Louden opened one of the packages contained inside one of the black plastic bags and found that it contained a green leafy substance that, based on his training and experience, he believed to be marijuana. The Wardens then asked for assistance from the Long Beach Police Department, who contacted LA BEST.

15. Members of LA BEST responded to Ballast Point at approximately 12:00 p.m. LA BEST SAs Erik LaRochelle and Michael Klinge searched the vessel and recovered approximately 48 packages of a green leafy substance believed to be marijuana. Each package was contained in a separate black trash bag.

16. RUIZ-ALVAREZ and ARELLANO-AGUAYO appeared calm while agents inventoried their vessel, and when asked they agreed to speak with LA BEST agents. At approximately 3:00 p.m. they were taken to the LA BEST office on Terminal Island in San Pedro, California.

C.  Interview of ARELLANO-AGUAYO

17. At approximately 4:12 p.m., SAs Timothy O'Hara, Miguel Ponce, and Nicholas Vasquez conducted a recorded interview of ARELLANO-AGUAYO. ARELLANO-AGUAYO was advised of his <u>Miranda</u> rights. He waived his <u>Miranda</u> rights and agreed to speak with

Instrumentality Protocol

the agents. The <u>Miranda</u> rights and the interview were in Spanish. ARELLANO-AGUAYO stated, in relevant part, the following:

    a. ARELLANO-AGUAYO said that he wanted to come to the United States but that he did not have papers to do so legally.

    b. ARELLANO-AGUAYO was asked by an acquaintance named Roman in Ensenada, Mexico to help take drugs from Ensenada to the United States. Roman would pay him $4,000 U.S. dollars.

    c. ARELLANO-AGUAYO knew that it was marijuana, but he did not know it was that much.

    d. When ARELLANO-AGUAYO arrived at the vessel in Ensenada it was already filled with the drugs.

    e. ARELLANO-AGUAYO and RUIZ-ALVAREZ departed Ensenada at approximately 9:00 p.m. on Saturday evening.

    f. ARELLANO-AGUAYO and RUIZ-ALVAREZ did not make any stops along the way, except to add extra fuel to the engine, which they brought with them.

    g. ARELLANO-AGUAYO had the phone number for the contact in Los Angeles that they were supposed to call upon arriving. ARELLANO-AGUAYO only knew the subject by the name "Viejon."

    h. ARELLANO-AGUAYO identified the SAMSUNG PHONE as his.

    D. **Interview of RUIZ-ALVAREZ**

18. At approximately 5:15 p.m., SAs Timothy O'Hara, Nicholas Vasquez and Taskforce Officer ("TFO") Felipe Diaz

Instrumentality Protocol

conducted a recorded interview of RUIZ-ALVAREZ. RUIZ-ALVAREZ was advised of his Miranda rights. He waived his Miranda rights and agreed to speak with the agents. The Miranda rights and the interview were in Spanish. RUIZ-ALVAREZ stated, in relevant part, the following:

    a. RUIZ-ALVAREZ works as a boat captain in Ensenada, Mexico. Approximately one month ago, unknown individuals in Ensenada threatened him in order to induce him to pilot a pleasure craft to the United States. RUIZ-ALVAREZ understood that the purpose of his piloting the pleasure craft was to smuggle drugs into the United States.

    b. The unknown individuals told him that a lot of people were being killed in Ensenada, and they implied that the same would happen to RUIZ-ALVAREZ and his family if he did not pilot the vessel to the United States. RUIZ-ALVAREZ said that unknown individuals passed by his house looking for him on several different days. The individuals finally found him and said it was time to pilot the vessel to the United States. They gave RUIZ-ALVAREZ a cell phone, a GPS, and $1,600 U.S. dollars.

    c. The first time RUIZ-ALVAREZ left Ensenada on the pleasure craft, he claimed to have disabled the motor so that it wouldn't run properly and they returned to port in Ensenada. The unknown individuals fixed the problem and sent RUIZ-ALVAREZ off again in the pleasure craft.

    d. At approximately 7:00 p.m. on Saturday, November 18, 2017, RUIZ-ALVAREZ and ARELLANO-AGUAYO departed Ensenada for the United States.

Instrumentality Protocol

e. RUIZ-ALVAREZ said that he used the GPS to navigate the pleasure craft to coordinates just off the coast of Rosarito, Mexico. RUIZ-ALVAREZ and ARELLANO-AGUAYO then met with another vessel which carried the marijuana bundles, and they performed an at-sea transfer to the vessel piloted by RUIZ-ALVAREZ.

f. RUIZ-ALVAREZ stated that he and ARELLANO-AGUAYO then continued on to the next coordinates on the GPS, which took them to the Alamitos Bay. RUIZ-ALVAREZ stated that he used the GARMIN to determine GPS coordinates.

g. Upon arriving at the Alamitos Bay, ARELLANO-AGUAYO said that he received a cell phone call from an individual asking him of his location. Before he could speak more with the individual, the CA DFW made contact with his vessel and the individual hung up.

h. RUIZ-ALVAREZ confirmed that the SONY PHONE was his.

E. Previous Search of SUBJECT DEVICES

19. After receiving Miranda warnings, ARELLANO-AGUAYO and RUIZ-ALVAREZ signed consents to search the GARMIN, SONY PHONE, and SAMSUNG PHONE. The Miranda warnings and the consents to search were given in Spanish, their native language.

20. LA BEST searched portions of the SONY PHONE, and the SAMSUNG PHONE. I am disclosing that the searches were conducted, but I do not rely on what was found during the searches for probable cause in this affidavit.

## V. FIELD TEST AND APPROXIMATE WEIGHT OF MARIJUANA

21. The 48 packages of marijuana recovered from the pleasure craft were transported to the LBPD property/evidence holding facility.

22. On November 19, 2017, SA Benjamin McArthur conducted a field test from a sample of one of the packages. The field test confirmed that the package contained a substance that has chemical properties consistent with that of marijuana.

23. Also on November 19, 2017, LA BEST TFO Diana Kelly was present at the LBPD property/evidence holding facility and assisted in weighing the 48 packages of marijuana. The total weight of the packages was approximately 1,119 pounds, including packaging. The packaging consisted of approximately two layers of clear plastic shrink wrap, and one layer of a light-colored plastic or nylon substance, as well as tape. Based on my training and experience, and on my discussions with TFO Kelly, and SA Erik LaRochelle, who also viewed the packages of marijuana, I believe that there was well in excess of 100 kilograms of marijuana in total seized from the pleasure craft.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

24. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

Instrumentality Protocol

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. Cellular telephones now often may contain many gigabytes of storage. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded

onto a hard drive, deleted, or viewed via the Internet.[2] Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive

---

[2] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

Instrumentality Protocol

requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

  e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence

Instrumentality Protocol

in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

  f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

  g. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by

Instrumentality Protocol

using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

25. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

26. For the reasons described above, I respectfully submit there is probable cause to believe that RUIZ-ALVAREZ and ARELLANO-AGUAYO violated Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(vii) (possession with intent to distribute marijuana). I also respectfully submit that there is probable cause to believe that evidence, fruits, and

Instrumentality Protocol

instrumentalities of the Subject Offenses will be found on the SUBJECT DEVICES.

/S/
Timothy O'Hara, Special Agent
Homeland Security
Investigations

Subscribed to and sworn before me this 20 day of November 2017.

**KAREN L. STEVENSON**

KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE